## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01885-SKC-SBP

ROSEANN RETTER,

      Plaintiff,

v.

FEDERAL EXPRESS CORPORATION,

      Defendant.

_____

### FIRST AMENDED COMPLAINT AND JURY DEMAND
_____

    Plaintiff Roseann Retter, through her counsel, Sara N. Maeglin, Mary Jo Lowrey, and J. Bennett Lebsack of Lowrey Parady Lebsack, LLC, hereby submits this First Amended Complaint and Jury Demand ("Amended Complaint") against Defendant Federal Express Corporation ("FedEx"), and alleges as follows:

### INTRODUCTION

    1.    Separating from her spouse in the summer of 2020, Ms. Retter searched for employment that allowed her to live independently and help provide for her daughters who were entering early adulthood. Ms. Retter was drawn to FedEx because it presented the opportunity to become a full-time employee and earn considerable overtime pay.

2.      Instead, Ms. Retter was harassed starting in her interview with FedEx, and throughout the entirety of her employment, until she had no choice but to constructively discharge her employment more than a year later.

3.      Her harasser, her direct supervisor Lance Moore, engaged in sex-based harassment nearly every shift they worked together. He touched her hair and rubbed against her back. He told her she smelled nice and asked whether she was lonely or went on dates. He learned as much information as he could about her life through her requests for time off, and then shared intimate details about her with her coworkers to insinuate they were in a romantic relationship. He referred to her daughters as "our girls," despite never meeting them.

4.      Ms. Retter did everything she was supposed to do to stop Mr. Moore's harassing conduct. She told Mr. Moore that he was making her uncomfortable. She told her other manager, James Campion, about Mr. Moore's inappropriate statements and conduct. She wrote a letter about the sex-based harassment to Mr. Moore's direct supervisor, Gabriel Rice. And she went to FedEx's human resources, Deena Washington, with a complaint of harassment.

5.      Mr. Moore's conduct towards Ms. Retter did not change. He indicated he was immune to discipline and termination because of his close friendship with a member of upper management. And from what she could tell, FedEx never disciplined him, so maybe he was telling the truth. With Mr. Moore's continued employment with FedEx and continued inappropriate conduct towards her, Ms. Retter had no choice but to constructively discharge her employment in October 2021.

## PARTIES

6.    Ms. Retter is a resident of and domiciled in Colorado. She resides in Fruita, Colorado.

7.    Defendant is a Delaware corporation with its principal place of business at 3610 Hacks Cross Road, Memphis, Tennessee 38125.

8.    Defendant operates its business throughout Colorado, including at the Grand Junction Ship Center located at 2796 Justic Drive, Grand Junction, Colorado 80156 (hereafter "GJTA FedEx Station").

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this case under 28 U.S.C. § 1331 because it arises under Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. § 2000e *et seq.*

10.    This Court also has jurisdiction over this case under 28 U.S.C. § 1332 because the parties have complete diversity of citizenship and the amount in controversy exceeds $75,000 not including interests and costs.

11.    Pursuant to 28 U.S.C. § 1391(b), venue is proper with this Court as Defendant operates its business throughout Colorado and all unlawful employment practices alleged herein occurred in this district.

12.    At all relevant times, Defendant was an "employer" pursuant to Title VII. 42 U.S.C. § 2000e(b).

13.    At all relevant times, Ms. Retter was an "employee" pursuant to Title VII. 42 U.S.C. § 2000e(f).

## JURISDICTIONAL PREREQUISITES

14.     On August 17, 2022, Ms. Retter filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (Charge No. 541-2022-00455) alleging sex discrimination and retaliation.

15.     On March 8, 2024, the EEOC issued a Notice of Right to Sue ("NRTS") letter to Ms. Retter.

16.     This lawsuit is timely filed within 90 days of receipt of the NRTS.

## GENERAL ALLEGATIONS

17.     According to its Position Statement to EEOC Charge No. 541-2022-00455 (hereafter "Position Statement"), FedEx is a business that "provides customers and businesses worldwide with a broad portfolio of transportation, e-commerce, and business services. FedEx ships time-sensitive documents and materials to businesses and homes."

18.     FedEx operates shipping centers throughout the United States.

19.     Within its shipping centers, packages arrive from across the country and world and are sorted to be delivered locally.

20.     On or around August 14, 2020, Ms. Retter began working for FedEx as a part-time casual courier at the GJTA FedEx Station.

21.     Specifically, Ms. Retter worked varied evenings Monday through Friday from 4:00 to 8:00 p.m. and Saturdays.

22.     As a part-time casual courier, her weekly hours varied between approximately 20 and 24 hours.

23.     In her role as a casual courier, her job duties included sorting packages on the line, loading and unloading her transport vehicle, simple maintenance on her transport vehicle, and delivery of packages.

24.     On or around June 3, 2021, FedEx offered Ms. Retter a full-time courier position at the GJTA FedEx Station. She accepted that same day.

25.     From the day she accepted a full-time position through the end of her employment, Ms. Retter worked approximately 50 hours a week, earning significant overtime pay.

26.     During the majority of Ms. Retter's employment with FedEx, Ms. Retter reported directly to Lance Moore, Station Manager for GJTA FedEx Station.

27.     Mr. Moore supervised Ms. Retter during her weekday day shifts.

28.     Ms. Retter also worked with James Campion, Station Manager at GJTA FedEx Station.

29.     Mr. Campion supervised Ms. Retter during the evening shifts on weekdays and on Saturdays.

30.     Regional Manager Gabriel Rice supervised Mr. Moore and Mr. Campion. Mr. Rice's office was located at GJTA FedEx Station; however, he was often not there during the hours Ms. Retter worked.

31.     Mr. Moore sexually harassed Ms. Retter throughout her employment with FedEx.

32.     After Ms. Retter applied for the part-time casual courier position, she was interviewed by Mr. Moore.

33.    During Ms. Retter's interview with Mr. Moore, Mr. Moore asked Ms. Retter if she was married.

34.    Ms. Retter told Mr. Moore that she was separated, to which he replied: "that doesn't hurt."

35.    Mr. Moore went on to say that "working late with the opposite sex could be hard on a marriage."

**A. After she was hired, Mr. Moore repeatedly touched Ms. Retter, commented on her appearance and smell, and indicated that he wanted to date her. Ms. Retter was uncomfortable with Mr. Moore's unwanted attention.**

36.    In the GJTA FedEx Station, couriers stood on a line sorting incoming packages.

37.    When Ms. Retter worked on the line sorting packages, Mr. Moore frequently came up behind her and touched her hair, her elbow, or the backside of her body, often while telling her or her coworkers that Ms. Retter smelled nice or that he liked her hair.

38.    Mr. Moore engaged in variations of this conduct several times a week throughout her employment with FedEx.

39.    Mr. Moore rubbed against Ms. Retter's backside approximately ten to twelve times.

40.    Mr. Moore's conduct on the sorting line was so frequent that Ms. Retter would squeeze her body as close to the line as possible to try to stop Mr. Moore from touching her.

41.    At least a couple of times a month, Mr. Moore would approach Ms. Retter and ask if she was lonely or found it hard to date in Grand Junction.

42.    He would also ask her how often she was asked out on dates.

43.    To try to stop his questions, Ms. Retter told him she had no interest in dating.

44.    On the topic of dating, Mr. Moore also repeatedly told her that women were "cruel," and they used men for their money.

45.    Ms. Retter told Mr. Moore that was not true otherwise she would not have two jobs.

46.    Because of Mr. Moore's frequent inappropriate behavior, Ms. Retter tried to surround herself with her coworkers or be in an open area when she had to interact with Mr. Moore. Ms. Retter's actions did very little to stop him.

**B. Mr. Moore made numerous comments to and around employees, and engaged in increasingly odd conduct, to insinuate that he and Ms. Retter were in a romantic relationship when they were not.**

47.    Around others, Mr. Moore repeatedly referred to Ms. Retter's daughters as "our girls."

48.    Ms. Retter repeatedly requested that Mr. Moore stop referring to her daughters as "our girls" out of concern that coworkers would assume they were in a romantic relationship.

49.    Mr. Moore refused to stop, often laughing off her requests.

50.    Mr. Moore made "our girls" comments about once or twice a week starting from when she was a part-time courier through the end of her employment.

51.     Despite the coronavirus pandemic, Mr. Moore drank from Ms. Retter's water bottle and attempted to give it back to her at least twice.

52.     Ms. Retter refused to drink from the same bottle as Mr. Moore.

53.     Mr. Moore appeared agitated when Ms. Retter refused to drink water from the same bottle. He became angry.

54.     On October 3, 2021, Ms. Retter had to fly to Texas to get her daughter after she was assaulted by her boyfriend.

55.     To get time off to support her daughter, Ms. Retter shared with Mr. Moore and Mr. Campion that her daughter was assaulted by her boyfriend.

56.     Between October 3, 2021, and her return to work on October 11, 2021, Mr. Moore contacted Ms. Retter several times asking for more information.

57.     Mr. Moore did not include Mr. Campion in these communications with Ms. Retter.

58.     In his communications, he asked her for more details about what happened to her daughter.

59.     Ms. Retter shared with Mr. Moore that her daughter was involved in a domestic incident, that her daughter was safe, and that she would return to work on October 11, 2021, after moving her daughter home from Texas.

60.     Mr. Moore wanted even more information. When Ms. Retter told him that made her uncomfortable, he became angry. He told her that he had "bent over backwards" for her and if she did not get back soon, he would have to give her route to someone else.

61.    On October 11, 2021, Ms. Retter returned to work.

62.    When she returned to work, several of Ms. Retter's colleagues approached her about her daughter.

63.    Ms. Retter was surprised because she did not tell any coworkers about what happened to her daughter except Mr. Moore and Mr. Campion.

64.    Several coworkers confirmed that Mr. Moore had told employees in the morning drivers' meeting, and then swing drivers in another meeting, that Ms. Retter's daughter was involved in a domestic violence event.

65.     Several coworkers told Ms. Retter that Mr. Moore told them to "not reach out and ask [her] anything," and if they wanted to know anything, to ask him, since they were "close."

66.    Ms. Retter also learned from her coworkers that Mr. Moore not only shared information about her daughter, but also shared false information about her daughter. He told her coworkers that her daughter was sexually assaulted, had been beaten "within an inch" of her life, and was hospitalized, all of which were not true.

67.    Ms. Retter went to Mr. Campion and complained. Mr. Campion stated he would forward her information to the Regional Manager, Gabriel Rice.

68.    Despite being forced to apologize and told to stay away from Ms. Retter, as described below, Mr. Moore continued to indicate to others that he and Ms. Retter were romantically involved.

69.    On or around October 19, 2021, the day Mr. Moore was forced to apologize, he held a morning drivers' meeting where he told everyone that he would

work "side-by-side" with her during the evening sort. He gave a suggestive smile and shoulder shake when he made the comment.

70.    Ms. Retter noticed her coworkers exchanging disgusted looks.

71.    Around the same time, Mr. Moore, who was injured, carried a tail pipe for her to her truck to be delivered. She did not ask him to do that.

72.    When a coworker saw Mr. Moore do that, he told Ms. Retter: "It must be nice to have the boss carrying your packages down that are heavy. He's never done that for me."

## C. Mr. Moore turned routine requests into opportunities to laud power over Ms. Retter.

73.    When Ms. Retter needed time off for a doctor's appointment, Mr. Moore would not approve without more personal information and would often indicate that he expected something in return for granting her requests.

74.    On one occasion, Ms. Retter asked Mr. Moore for time off for a doctor's appointment.

75.    Mr. Moore insisted on knowing the reason for her doctor's appointment.

76.    Ms. Retter told Mr. Moore that she did not want to provide him with her medical background.

77.    Mr. Moore told her that he would "do her a favor" and that she could go during her lunch break if the appointment didn't take her too far off her route.

78.    Ms. Retter went to her appointment and when she returned to the station after her deliveries were made, Mr. Moore told her: "you owe me."

79.    Ms. Retter responded by telling Mr. Moore that she did not care for how he spoke to her and that he made her feel uncomfortable.

80.    Ms. Retter requested time off for an appointment on July 13, 2021.

81.    Mr. Moore refused to grant Ms. Retter's time-off request for that day until she would tell him the reason behind her time-off request, stating: "I am doing you a favor. If you tell me why then I can let you off. Do we have an agreement?"

82.    Ms. Retter told him that it was personal and that she did not feel comfortable sharing personal information with him.

83.    Mr. Moore only granted Ms. Retter's time off request after she told him she needed the day to sign documents for her divorce.

84.    That interaction left Ms. Retter feeling humiliated and embarrassed.

85.    Between one and a couple of times each week, Mr. Moore would comment: "You should appreciate how often I go to bat for you"; "you owe me"; and "I am doing you a favor."

**D. Ms. Retter raised multiple hostile work environment complaints. FedEx failed to appropriately respond, causing Ms. Retter to constructively discharge her employment.**

86.    Ms. Retter went to Mr. Campion on several occasions to complain about Mr. Moore's sexually harassing behavior.

87.    One of her complaints to Mr. Campion was in the summer of 2021 before a "drive through" scheduled with Mr. Moore.

88.    FedEx requires couriers, like Ms. Retter, to perform "drive throughs" with their supervisors to ensure they are meeting driver safety standards and complying with company protocol.

89.    In her complaint to Mr. Campion, Ms. Retter told Mr. Campion she was uncomfortable being alone with Mr. Moore during her drive through.

90.    She reminded Mr. Campion about Mr. Moore's inappropriate conduct towards her.

91.    Mr. Campion told her to contact Mr. Rice or Human Resources.

92.    Mr. Campion completed the drive through with Ms. Retter.

93.    Soon after she completed the drive through with Mr. Campion, Ms. Retter left a note on Mr. Rice's desk in his office. In the note, shown below, Ms. Retter complained about a sex-based hostile work environment and requested help:

Gabriel,

I was advised to reach out to regarding the behaviors and ultimately the situation where Lance has acted inappropriately, unprofessionally, and with intent to cause a work environment that has left me feeling uncomfortable and unsafe. I know that you are aware of his continued interest in my personal affairs with not only my divorce proceedings, but also speaking about my children as "our girls". I have asked him repeatedly to stop and let him know that my personal life is exactly that, my personal life, and while he tells me that he thinks of us all as family, his behavior and comments on my personal life is unwanted and has caused gossip and rumors among my coworkers. It is my understanding that you changed the ride along and moved Lance out and had James go with me instead. I appreciate that! I also want you to know that Lance continues to make comments directly to me that my position is at risk if I withhold information regarding the need for any absence, and if he finds the reasoning to be a necessity. I had a doctor's appointment last week and instead of letting me take the afternoon off for it, he said I could use my lunch for the appointment but he wanted to know what it was for. When I told him that I didn't feel comfortable sharing that with him, and I didn't think it was okay for him to even ask, he told me I must not enjoy my job and he was doing me a favor by letting me go during my lunch because it would take me away from my route. I am extremely uncomfortable with how he will touch or brush up against me when I am loading the truck, he also finds it necessary to put his hands in my hair and I am consistently telling him to stop and I am always looking for a way to avoid direct contact with him. I know that I am not the only one he does this to, and the fact that he continues to behave inappropriately to me and others is unacceptable. I would like to have a further conversation with you regarding Lance's behavior and what I can expect to happen, as I do not feel comfortable or safe working directly with him.

Thank you,

Roseann Retter

808-987-3807

94.    Mr. Rice did not speak with Ms. Retter at any point about her note, nor did he ask what she meant when she wrote "…Lance has acted inappropriately, unprofessionally, and with intent to cause a work environment that has left me feeling uncomfortable and unsafe."

95.    Ms. Retter does not know if Mr. Rice took any action related to her note.

96.    Mr. Moore's inappropriate conduct, as described in the note, continued after her complaint to Mr. Rice.

97.    After complaining to Mr. Campion about Mr. Moore spreading information about her daughter's assault on October 11, 2021, Mr. Moore called Ms. Retter and one other employee into his office on or about October 19, 2021.

98.    Mr. Moore spoke with both employees about their delivery and pick up schedules for the day, and then excused Ms. Retter's coworker.

99.    Mr. Moore then asked Ms. Retter to close the door.

100.   Ms. Retter refused, telling Mr. Moore it made her uncomfortable and she did not want to close the door.

101.   Mr. Moore proceeded to explain that he had been spoken to by Mr. Rice and was told to apologize for sharing Ms. Retter's personal information about her daughter's domestic situation.

102.   Ms. Retter told Mr. Moore that what he did was wrong and the information that he spread was exaggerated and inaccurate, such as stating that her daughter was beaten within an inch of her life.

103. Mr. Campion informed Ms. Retter that Mr. Rice directed Mr. Moore to distance himself from Ms. Retter.

104. Mr. Moore did not keep his distance from Ms. Retter after the apology.

105. He continued to touch her or attempt to touch her; and make comments and take actions to indicate they were romantically involved.

106. After Mr. Moore did not cease his inappropriate contact, Ms. Retter told Mr. Campion that Mr. Moore continued to touch her and make comments toward and about her indicating they were in a relationship.

107. In addition, Ms. Retter became so nervous to work directly with Mr. Moore that she began involuntarily vomiting before work each day.

108. Ms. Retter told Mr. Campion that she had been vomiting because of the stress of working in close proximity with Mr. Moore.

109. Mr. Campion gave her the contact information for Human Resources Deena Washington.

110. From October 21 through October 26, 2021, Ms. Retter had two or three phone calls with Ms. Washington where she complained about sex-based harassment, and eventually, or October 26, her need to resign her employment.

111. In those calls, Ms. Retter told Ms. Washington that she documentation and witnesses to many of Mr. Moore's behaviors and conversations.

112. Ms. Retter told Ms. Washington about the touching and inappropriate comments.

113.     Because Mr. Moore's conduct persisted even as she was talking to Ms. Washington, Ms. Retter was forced to resign her employment.

114.     On or around October 24, 2021, she gave Mr. Rice a letter of resignation. In the letter, Ms. Retter stated that her last day of work would be on October 30, 2021.

115.     However, on or around October 26, 2021, Ms. Retter was approached by a male coworker and asked if she knew when Mr. Moore would be back in the station.

116.     Ms. Retter told her coworker she did not know what Mr. Moore's schedule was or when he would be back, to which he responded: "well he knows everything about you."

117.     Ms. Retter tried to ignore the comment and headed to the containers to help with unloading.

118.     Ms. Retter became so frustrated and shaken by the comment she had no other option but to speak with Mr. Rice directly and end her employment that day.

119.     Ms. Retter went to Mr. Rice's office and told him she was resigning.

120.     Ms. Retter told Mr. Rice how the continued attention that Mr. Moore placed on her was affecting her safety, her interactions with her coworkers, and her overall mental health.

121.     Mr. Rice stated he did not want to lose her as an employee and asked if there was anything that could be done.

122.    Ms. Retter told Mr. Rice how Mr. Moore told her he was required to apologize to her and Mr. Campion told her Mr. Moore was required to stay away from her.

123.    Ms. Retter explained that the opposite took place: Mr. Moore spent more time near her, and he insinuated to the other employees that he and Ms. Retter were in a relationship.

124.    Ms. Retter explained to Mr. Rice that she felt unsafe around Mr. Moore and could no longer work with him.

125.    Ms. Retter told Mr. Rice that she would stay if Mr. Moore no longer worked there.

126.    Mr. Rice did not say he was going to remove Mr. Moore.

127.    Without a guarantee that the harassment would stop, Ms. Retter had no choice but to end her employment with Defendant.

**E. FedEx knew that Mr. Moore was a serial harasser and failed to take appropriate action to end the harassment.**

128.    Before, during, and after Ms. Retter's employment, Mr. Moore harassed other employees, some based on sex.

129.    In its Position Statement, FedEx admitted that at least one female employee raised a complaint that she was touched by Mr. Moore.

130.    In its Position Statement, FedEx admitted that Mr. Moore received a Warning Letter in November 2020 based on that complaint.

131.    Upon information and belief, Mr. Moore engaged in sex-based harassment toward Christine Esep.

132.    Upon information and belief, Mr. Moore engaged in sex-based harassment towards Amy Rice.

133.    FedEx terminated Ms. Rice's employment soon after she provided information to the Equal Employment Opportunity Commission.

134.    Upon information and belief, other employees complained about Mr. Moore's conduct or behavior, and their complaints were not resolved. One employee, Diane Dyke, complained to Human Resources about Mr. Moore.

135.    Upon information and belief, FedEx did not resolve Ms. Dyke's complaint against Mr. Moore.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF
Hostile Work Environment Based on Sex in violation of Title VII, as amended,
42 U.S.C § 2000e *et seq.*

136.    Plaintiff incorporates all allegations in this pleading into this claim for relief.

137.    Plaintiff belongs to a protected class under Title VII because she is a woman.

138.    Defendant created a hostile work environment based on Plaintiff's sex.

139.    The conduct complained of was unwelcome.

140.    The conduct complained of was offensive.

141.    The conduct complained of was offensive in nature and directed at Plaintiff because of her sex.

142.    The conduct complained of was sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment by creating an abusive working environment and culminating in her constructive discharge.

143.    Defendant knew or should have known about the conduct to which Plaintiff was subjected and failed to implement reasonably prompt and appropriate corrective actions.

144.    As a result of Defendant's unlawful employment practice, Plaintiff has suffered and continues to suffer harms, damages, and losses, including physical and mental pain and suffering, embarrassment, humiliation, emotional distress, indignity, impairment of the quality of life, lost wages, and loss of earnings potential.

## SECOND CLAIM FOR RELIEF
Retaliation in violation of Title VII, as amended,
42 U.S.C. § 2000e *et seq.*

145.    Plaintiff incorporates all allegations in this pleading into this claim for relief.

146.    Plaintiff engaged in protected activities when she made numerous complaints opposing a sex-based hostile work environment to members of management and human resources, including Mr. Campion, Mr. Rice, and  Ms. Washington.

147.    As a result of Plaintiff's protected activity, Defendant retaliated against Plaintiff by further subjecting her to an intolerable hostile work environment and causing her to constructively discharge her employment.

148.    Plaintiff's protected activities were a motivating factor for Defendant's adverse actions.

149.    As a result of Defendant's unlawful employment practice, Plaintiff has suffered and continues to suffer harms, damages, and losses, including physical and mental pain and suffering, embarrassment, humiliation, emotional distress, indignity, impairment of the quality of life, lost wages, and loss of earnings potential.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Roseann Retter respectfully requests that this Court enter judgment in her favor against Defendant Federal Express Corporation and order the following relief as allowed by the law:

A. Compensatory damages, including, but not limited to, those for emotional distress, inconvenience, embarrassment, humiliation, physical and mental pain and suffering, indignity, and impairment of quality of life;

B. Back pay and benefits;

C. Reinstatement or front pay and benefits;

D. Injunctive and/or declaratory relief;

E. Punitive damages;

F. Attorneys' fees and costs of the action, including expert witness fees, as appropriate;

G. Pre-judgment and post-judgment interest at the highest lawful rate; and

H. Such further relief as justice allows.

## JURY DEMAND

Plaintiff hereby demands a jury on all issues so triable.

DATED this 24th day of September 2024

By: Lowrey Parady Lebsack, LLC

*/s/ Sara N. Maeglin*
Sara N. Maeglin
Mary Jo Lowrey
J. Bennett Lebsack
1490 Lafayette Street, Suite 304
Denver, CO 80218
Tel. (303) 593-2595
Fax (303) 502-9119
sm@lowrey-parady.com
maryjo@lowrey-parady.com
ben@lowrey-parady.com

ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
588 Orchard Ridge Drive
Fruita, CO 81521

## CERTIFICATE OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By: Lowrey Parady Lebsack, LLC

*/s/ Sara N. Maeglin*
Sara N. Maeglin
1490 Lafayette Street, Suite 304
Denver, CO 80218
Tel. (303) 593-2595
Fax (303) 502-9119
sm@lowrey-parady.com

*/s/ Mary Jo Lowrey*
Mary Jo Lowrey
1490 Lafayette Street, Suite 304
Denver, CO 80218
Tel. (303) 593-2595
Fax (303) 502-9119
maryjo@lowrey-parady.com

*/s/ J. Bennett Lebsack*
J. Bennett Lebsack
1490 Lafayette Street, Suite 304
Denver, CO 80218
Tel. (303) 593-2595
Fax (303) 502-9119
ben@lowrey-parady.com